[Cite as *State v. Lawrrence*, 2023-Ohio-3419.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | **CASE NO. 2022-L-110** |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the<br>Court of Common Pleas |
| JULIAN K. LAWRENCE, | |
| Defendant-Appellant. | Trial Court No. 2021 CR 001457 |

**O P I N I O N**

Decided: September 25, 2023
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, *Jennifer A. McGee* and *Adam M. Downing*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Ruth Fischbein-Cohen*, 3552 Severn Road, Suite 613, Cleveland Heights, OH 44118 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Julian K. Lawrence, appeals from his convictions and/or sentences for Aggravated Murder, Murder, Felonious Assault, Kidnapping, and Trafficking in Marijuana, in the Lake County Court of Common Pleas. For the following reasons, we affirm the judgment of the lower court.

{¶2} On May 20, 2022, Lawrence was indicted by the Lake County Grand Jury for Aggravated Murder (Count One), in violation of R.C. 2903.01(A); Murder (Count Two), in violation of R.C. 2903.02(A); Attempted Murder (Count Three), a felony of the first

degree, in violation of R.C. 2903.02(A) and R.C. 2923.02(A); Felonious Assault (Count Four), a felony of the second degree, in violation of R.C. 2903.11(A)(2); two counts of Kidnapping (Counts Five and Six), felonies of the first degree, in violation of R.C. 2905.01(A)(3) and (B)(2); and Trafficking in Marijuana (Count Seven), a felony of the fifth degree, in violation of R.C. 2925.03(A)(1). Each count had firearm specifications under R.C. 2941.145 and Count Seven also had a firearm specification under R.C. 2941.141.

{¶3} A jury trial was held on September 20 through October 13, 2022. The following pertinent testimony and evidence were presented:

{¶4} On November 3, 2021, Detective Michael Legg of the Cleveland Division of Police, was dispatched to the scene of a homicide in Cleveland, where a victim, Malik Pace, had died from gunshot wounds. No arrests were made in connection with that homicide.

{¶5} On November 4, 2021, Painesville police officers were dispatched to a call of a shooting at 55 Grant Street in Painesville around 6:20 p.m. When Patrolman Roberto Soto arrived at the scene, the Grant Street Apartments, he observed Lawrence standing in the street. Soto inquired whether everything was alright and Lawrence stated, "I had to do it. He tried to rob me." The dash cam video also reflects that Lawrence stated "I don't know who this is that tried to rob me." Lawrence pointed and Soto observed a vehicle in the parking lot that had struck another one. Soto observed a man, later identified as Ollie Gipson, in one of the vehicles. Gipson had been shot and was pronounced dead at the scene. Soto saw a gun in Gipson's left hand. According to Soto's description, it appeared that Gipson did not have a good grip on it, did not have his finger on the trigger, and the barrel was pointed toward the front of the vehicle. Soto indicated

2

that he told the grand jury "when I saw him, it appeared to me that at one point either he was trying to use it, or that he tried to do something with it, that's what I observed."

{¶6} Brianna Prugel of the Painesville Police Department also responded to the scene. When she arrived, she observed Lawrence, who had a holster on the inside of his waistband and a Glock 23 in his possession. When she approached him, he indicated that he had a CCW license and pointed to his gun. She inquired if he was ok and he said, "I almost f***in' died." Lawrence indicated: "I was walking around in the parking lot and a car pulled up next to me asking if I had a lighter." He then stated "I don't f***in' know you" and the man then pulled a gun on him. When asked what happened next, Lawrence responded, "I don't know, he pulled a gun on me and I blanked out." Chelsea Hounshell, a 911 dispatcher riding along with Prugel, testified that Lawrence stated the car's window tint was dark and he could not identify the occupant. Prugel took Lawrence into custody and he had $108 in his possession at that time, including a $100 bill.

{¶7} Sargeant Josh Rogers indicated that Gipson, known to Rogers from past criminal involvement, was in the driver's seat of a Lincoln that had crashed into another car and was still in drive and running when officers arrived. Discovered in the vehicle were an empty Glock magazine and a package later confirmed to contain marijuana on the front driver's side floorboard. Gipson's firearm, a Glock, had 11 bullets in the magazine and one that was chambered. A gun receipt revealed that Gipson's firearm and the ammo had been purchased the day of the shooting. According to Detective Don Ticel, Gipson's hands were not swabbed for gunshot residue because BCI would not accept gunshot residue kits from victims of a shooting.

{¶8} Detective Ticel indicated that 14 shell casings were recovered at the scene

3

of the crime in a linear position, with a distance of 63 feet from beginning to end. Lawrence's cell phone was recovered in the parking lot "prior to any casings." The firearm in Lawrence's possession had 9 bullets and held 23 rounds with an extended magazine.

{¶9} Ticel described video recordings which showed Lawrence's and Gipson's vehicles driving toward Grant Street around the same time, a few minutes before the shooting was reported. Surveillance video from a nearby parking lot showed Lawrence approach the passenger side of Gipson's vehicle, the brake lights turn on, what Ticel described as a "muzzle flash," and the car rolling forward out of frame.

{¶10} Ticel interviewed Lawrence after the incident, who made statements including: "he pulled a gun on me" and "he tried to rob me," "maybe I should have just let him shoot me," "someone tried to rob me," and "I had to use my weapon." Ticel also interviewed other witnesses with knowledge of the shooting and discovered that two individuals, Jeffrey Isaacs and Edgar Torres, were in Gipson's vehicle during the shooting. He indicated that they were initially not completely honest when being interviewed but did provide information about the shooting. Pursuant to discussions with Torres, Ticel recovered gun ammunition and a gun box that had been discarded in a wooded area on Mentor Avenue. No gun ammo or casings of the type found in Gipson's gun and recovered from the woods were found at the scene of the shooting.

{¶11} The witnesses identified by Ticel testified regarding the events on November 4. Isaacs and Torres were friends with Gipson and also knew Lawrence. They indicated that they were aware Gipson had possession of dogs that had belonged to Pace. Isaacs heard rumors that Gipson had killed Pace on November 4. Gipson indicated to Isaacs that he was aware people were saying he killed Pace.

4

{¶12} Isaacs and Torres were with Gipson on November 4 and went with him to the gun store where Isaacs' sister purchased a firearm for Gipson because he was legally unable to do so. After the gun was purchased, they went to a friend, Porras', house. Gipson got out of the vehicle while the men remained inside. Another friend, Robert Howard, was present at Porras' home and observed Lawrence and his brother drive past, and believed they "were looking kinda weird" as they were braking and stopping. He testified that when Gipson left the home, he seemed scared. Torres and Isaacs indicated that when Gipson returned to the car, he seemed worried or "mad."

{¶13} Afterwards, Gipson called Lawrence. Isaacs heard Gipson say he wanted to "clear his name," and talk to Lawrence about the rumors he murdered Pace. Torres indicated that they went to meet Lawrence to buy weed and for Gipson to talk to him about a "problem they had going on." Howard testified that he was also aware Gipson intended to meet up with Lawrence to talk about rumors he killed Pace and did not intend to rob him. According to the witnesses, although Gipson wanted to meet elsewhere, Lawrence asked that they meet at Grant Street. At the request of Gipson, Isaacs called their friend, Jamiroquai Transou, and asked him to meet them there as well. Gipson called Lawrence a second time and made a deal to buy $100 of marijuana. Isaacs was sitting in the front passenger seat and Torres in the back seat.

{¶14} According to Isaacs, when they arrived at Grant Street, Gipson had his gun in his coat pocket. He testified that Gipson racked the gun on the way over and Torres indicated that Lawrence "put one in the chamber when we got into Grant Street Apartments." Gipson told Isaacs to lean his seat back, in case "something get wicked," i.e., they began shooting at each other. According to Isaacs, Lawrence approached the

5

passenger side, gave Gipson the marijuana, and Gipson gave him $100. Gipson indicated to Lawrence that he wanted to speak to him in his car. Lawrence asked "what you all 'bout to do?" Gipson repeated that he wanted to speak to him in his car and Lawrence did not respond. According to Isaacs, Lawrence looked mad or frustrated and asked "are you lacking," which means a person does not have a gun. Both witnesses indicated that Gipson then pulled out and showed Lawrence his gun, with the barrel pointed down and toward the steering wheel. Gipson did not have his finger on the trigger, did not point the gun toward Lawrence and did not threaten Lawrence. Lawrence then fired at Gipson. The passenger window was down and Lawrence fired from outside of the car. Isaacs tried to get into the back seat of the car. He told Gipson to "go" but there was no response. The car began to move/roll and Lawrence continued shooting while following the car. While shooting, Lawrence said "you tried to rob me." Torres indicated they did not try to rob him and no threats were made.

{¶15} Lawrence then turned the gun on Isaacs but it jammed. Lawrence opened the door, grabbed Isaacs by the arm, took him out, and said to Isaacs "call the police and say you robbed me." He said he would kill Isaacs if he did not call the police. Isaacs complied and called the police. Transou pulled up and Lawrence told him to leave and threatened to shoot him. Isaacs then walked away and Torres exited the vehicle, taking the ammo out of the car. Torres testified that he threw it in bushes at the nearby Salvation Army. Both Torres and Isaacs indicated that they had initially lied to the police because they were on probation or bond and were afraid of getting in trouble.

{¶16} Transou testified that he was aware of rumors Gipson had killed Pace. He got a call from Gipson on November 4, who asked "you think [Lawrence] gonna kill me in

6

Case No. 2022-L-110

front of you?" Transou had agreed to meet with Gipson at Lawrence's house, then received a text to meet at Grant Street. When he arrived at Grant Street, he saw Gipson's car was crashed. He observed Isaacs on the phone and Lawrence pointing a gun at Isaacs. Lawrence approached and told him to leave.

{¶17} Howard and Aishah Bowler-Dixon, Gipson's girlfriend, both testified that they had also heard rumors that Gipson killed Pace prior to the foregoing incident. Bowler-Dixon explained that Gipson was in possession of dogs that had been owned by Pace. Gipson told her that one of his friends had taken the dogs. Howard also indicated that had heard Lawrence make statements about his CCW prior to this incident. Howard believed Lawrence looked down on others because they didn't have "that level of * * * gunmanship," and made comments about it being a "get out of jail free card."

{¶18} Detective Vincent Crews of the Painesville Police Department testified regarding various social media communications reviewed in this matter. Several Snapchat messages were sent between Lawrence and friends and posted to Facebook on or around November 3-4, indicating that Lawrence was upset and saddened by Pace's death. Lawrence posted a Snapchat message that stated: "They gon feel this pain, big bro, I promise. * * * I love you @lik gambino1 [Pace]. Wat[c]h over, and guide me through this world * * * of hate." A friend sent a response, stating: "I know you broken for your boy, but stay strong. Don't get in no s**t over it, and watch your back always." Lawrence responded "no, they stole 4 puppies, smh, and it gotta be they been plottin' on him. But yeah, I'm f***ed up over this." Records also indicated that Gipson had called Lawrence on Snapchat two times just prior to the time of the shooting. Messages between Gipson and Pace were also presented, which contained discussions between the two regarding

7

Gipson's desire to get dogs from Pace.

{¶19} Curtiss Jones, Cuyahoga County Regional Forensic Science Laboratory supervisor of trace evidence, examined Gipson's vehicle. He indicated that there were several spent bullets in the front of the vehicle. He determined that the bullets went through the passenger's side "window door area" and the driver's side door. He indicated they either went through an open passenger's door or window. Jones examined Gipson's clothing and was able to determine that at least some of the bullets were fired from at least four to five feet away. He observed six bullet entrance holes on the coat, four on his pants, and two on a head covering.

{¶20} Dr. Antoine Wrice testified that Gipson had 13 bullet entrance wounds and died from "gunshot wounds of the head, trunk, and extremities with brain, visceral and skeletal injuries."

{¶21} Raymond Jorz of the Lake County Crime Laboratory examined the 14 spent casings recovered from the scene and determined they were all fired from Lawrence's gun. Nothing was submitted that was fired from Gipson's firearm. Some fragments recovered from the vehicle and Gipson's body could also be traced back to the type of ammunition submitted with Lawrence's firearm.

{¶22} For the defense, Lawrence testified that he knew Gipson through his nephew. He sometimes sold Gipson and his friends marijuana. Lawrence indicated that on November 3, his friend, Pace, was killed, but he did not hear any rumors about who killed him and had no animosity against Gipson.

{¶23} On November 4, Gipson called to purchase marijuana from Lawrence and requested to meet at the Grant Street Apartments. When Lawrence arrived at the

8

apartments, his car was smoking and he planned to walk home to get his AAA card. At that time, a vehicle pulled up and he could not tell who the driver was due to the dark tint on the windows. The vehicle stopped and the window was rolled down a little. He then heard the driver ask for a lighter and Lawrence stated that he did not have one. The driver then rolled down the window more and he was able to recognize Gipson. Gipson gave him money and, as Lawrence was reaching for the marijuana, he heard, "don't move, give me your money or I'm gonna shoot you." Lawrence saw Gipson point a gun toward his face and he froze. He then threw the marijuana inside of the car. He grabbed his own gun and pointed it at Gipson and Gipson extended his gun more toward his face. Lawrence believed that his life was in danger and Gipson would shoot him. Lawrence began shooting. He ran toward the parking lot exit and the car was following him so he continued to shoot. He described that the car was accelerating. He began to "shoot and * * * duck" and continued firing since the gun was still pointed at him and the car was moving.

{¶24} Lawrence testified that he did not point his gun at or threaten Isaacs, who got out of the car on his own and ran away. He testified that he had a CCW and was familiar with how to utilize a firearm. He denied asking Gipson if he was "lacking." Lawrence remained at the scene until the police arrived.

{¶25} The jury acquitted Lawrence of Attempted Murder but found him guilty of all other counts as charged in the indictment as well as the accompanying firearm specifications.

{¶26} A sentencing hearing was held on October 26, 2022. The court merged the offense of Murder into Aggravated Murder and merged Felonious Assault and the second

9

count of Kidnapping with the first count of Kidnapping. Defense counsel emphasized Lawrence's lack of a criminal record. The court found: "The evidence was that this was in retaliation for a perceptive wrongdoing on the part of the deceased, and actually the Court does consider it to be an execution." It sentenced Lawrence to serve a prison term of thirty years to life in prison on Count One, with a mandatory prison term of three years in prison for the Firearm Specification; a term of eight to twelve years in prison on Count Five, with a term of three years for the Firearm Specification; and one year on Count Seven. The two firearm specifications were ordered to be served consecutive to each other and the other offenses. Counts One and Five were ordered to be served consecutively with each other and concurrent with the sentence on Count Seven for a total term of 44 to 48 years to life. This sentence was memorialized in an October 27, 2022 Judgment Entry.

{¶27} Lawrence timely appeals and raises the following assignments of error:

{¶28} "[1.] Whether It Was Error To Convict Defendant And Not To Consider Self Defense.

{¶29} "[2.] It Was Error To Sentence Appellant Separately As This Case Involves Allied Offenses Of Similar Import.

{¶30} "[3.] The Sentence Was Against The Sufficiency of The Evidence And The Manifest Weight Of The Evidence.

{¶31} "[4.] The Sentence Was Void Since It Violated The Law Which Favors Concurrent Sentences."

{¶32} In his first assignment of error, Lawrence argues it was error to determine that he did not commit the shooting in self-defense since the facts demonstrated he shot

10

only after Gipson pulled his firearm. Similarly, in his third assignment, he argues that he did not have intent or motive to kill Gipson and that the killing was the result of self-defense. Since these issues are interrelated, we will consider them jointly.

{¶33} Initially, we observe that, under the first assignment of error, Lawrence states that this court may reverse if it "clearly and convincingly finds error," citing to R.C. 2953.08(G)(2). That statute applies to the review of a trial court's sentence and is unrelated to the defendant's convictions and defenses to those convictions. Here, the issue is whether the convictions were supported by the weight and sufficiency of the evidence presented and whether the claim of self-defense precluded his convictions.

{¶34} In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶35} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

11

and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the weight of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Heald*, 11th Dist. Lake Nos. 2021-L-111 and 2021-L-112, 2022-Ohio-2282, ¶ 19.

{¶36} Pursuant to R.C. 2901.05(A), "[t]he burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused." Division (B)(1) provides that a person may act in self-defense and states: "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." R.C. 2901.05 "places the burden of persuasion upon the State to disprove at least one of the elements of self-defense beyond a reasonable doubt." *State v. Corey*, 11th Dist. Geauga No. 2021-G-0029, 2022-Ohio-4568, ¶ 104.

{¶37} The elements of a valid claim of self-defense have been found to include: "(1) the defendant was not at fault in creating the situation giving rise to the affray (2) the defendant had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Effective April 6, 2021,

12

R.C. 2901.09(B) altered the law on the duty to retreat, providing that "a person has no duty to retreat before using force in self-defense, * * * if that person is in a place in which the person lawfully has a right to be."

{¶38} Lawrence's claim that his convictions, particularly for Aggravated Murder were not supported by the weight or sufficiency of the evidence, turns on his argument that the jury should have found he acted in self-defense.

{¶39} The evidence presented supported the jury's rejection of the claim of self-defense. In particular, it supports a determination that Lawrence did not have a bona fide belief that he was in danger of great bodily harm necessitating the use of deadly force. Two witnesses present in the vehicle stated that Gipson did not threaten Lawrence or point a gun at him and only showed that he had a gun when asked by Lawrence.

{¶40} Lawrence argues that self-defense was supported by the record because Gipson arranged the meeting to clear his name of the killing of Pace, and that Gipson was a "known murderer" who "gunned down Mr. Pace in the front yard, in the middle of the day." While it is correct that Gipson sought the meeting with Lawrence, the evidence does not demonstrate he had a plan to harm Lawrence when they met. Further, references to Gipson as a "known murderer" of Pace are inappropriate when he was not charged or convicted with such offense. Nonetheless, it is accurate that rumors associated Gipson with the crime. Lawrence questions: "What motive could Julian Lawrence have had to kill Ollie Gipson?" His question is answered by his own repeated arguments that Gipson was a "murderer." There is no question that there were rumors about Gipson having killed Pace and that Lawrence was upset over Pace's death. While Lawrence asserts this as grounds for the fact that he committed self-defense and that

13

Case No. 2022-L-110

Gipson was violent, it also provides potential motivation to murder Gipson.

{¶41} While Lawrence concludes self-defense occurred by referencing his own testimony that Gipson threatened to shoot him, Isaacs' and Torres' testimony directly refutes this. They indicated that Gipson did nothing to provoke the shooting, he showed his gun to Lawrence only upon being asked if he had a weapon, and did not point the gun toward Lawrence or display it in a threatening manner. They testified that no robbery occurred. "A self-defense claim is generally an issue of credibility." *State v. Olsen*, 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. "Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact." *State v. Bentley*, 2023-Ohio-1792, __ N.E.3d __, ¶ 24 (11th Dist.). "It has been held that 'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version' and rejected the defendant's claim of self-defense." *Id.*, citing *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 49 (10th Dist.). When weighing witness testimony supporting a claim of self-defense, the trier of fact is "free to believe or disbelieve the testimony of the witnesses" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *Bentley* at ¶ 24, citing *State v. Haney*, 11th Dist. Lake No. 2012-L-098, 2013-Ohio-2823, ¶ 43. It is evident here that the jury chose to believe the testimony of Isaacs and Torres and we will not second-guess that determination.

{¶42} There is further evidence to support the testimony of Isaacs and Torres and contradict Lawrence's claim of self-defense. Although Lawrence stated he was in fear for his life, he continued to walk with the car as it was rolling/moving forward rather than

14

turning in the opposite direction. He fired 14 shots into the vehicle with the casings spanning 63 feet in the direction the car moved after Lawrence began shooting. 13 of these shots hit Gipson and none hit the other two men present in the vehicle. Lawrence initially told police he did not know who the person was that he had shot, which was untrue and inconsistent with his testimony. By presenting the testimony of Isaacs and Torres as well as demonstrating conflicts in Lawrence's testimony, the State satisfied its burden of persuasion to disprove at least one of the elements of self-defense.

{¶43} Lawrence makes much of the fact that Gipson arrived to their meeting in a car with tinted windows. Having tinted windows is not evidence of committing a crime, nor is it uncommon, particularly among drug users or sellers.

{¶44} Having found that the evidence supported the jury's rejection of Lawrence's claim of self-defense, the manifest weight of the evidence, and thus, sufficient evidence, supports his conviction for Aggravated Murder. To convict Lawrence of Aggravated Murder, the State was required to prove, beyond a reasonable doubt, that he did "purposely, and with prior calculation and design, cause the death of another." R.C. 2903.01(A). There was evidence that Lawrence had a motive to kill Gipson and shot only him, although there were two other men present in the vehicle. There was also testimony that he chose the location of the meeting, providing further support of his potential planning of the shooting. As to the offenses of Murder and Felonious Assault, "where allied offenses are merged and there is sufficient evidence on the offense for which defendant is sentenced, errors relating to sufficiency and weight of the evidence on the count that is merged are harmless and need not be considered." *State v. Abdullah*, 2022-Ohio-3977, 200 N.E.3d 627, ¶ 28 (11th Dist.).

15

{¶45} While Lawrence does not specifically raise manifest weight or sufficiency arguments as to the other charges for which he was both convicted and sentenced, we observe that these were also supported by the evidence. To convict Lawrence of Kidnapping, the State was required to prove that he did "by force, threat, or deception, * * * remove another from the place where the other person is found or restrain the liberty of the other person" to "terrorize, or to inflict serious physical harm on the victim * * *." R.C. 2905.01(A)(3). Here, Lawrence removed Isaacs from the vehicle and terrorized him by threatening to kill him. These elements are not disputed in appellant's brief. As to Trafficking in Marijuana, the State was required to prove that Lawrence did knowingly "[s]ell or offer to sell a controlled substance or a controlled substance analog." R.C. 2925.03(A)(1). Testimony established that Lawrence provided, in exchange for money, marijuana to Gipson. This constituted the knowing sale of a controlled substance.

{¶46} Finally, we observe that under his third assignment of error relating to the weight and sufficiency of the evidence, Lawrence also argues that the prosecutor asked irrelevant and "harassing" questions during his cross-examination. The State counters that this issue is not properly addressed since it was not assigned as error.

{¶47} App.R. 12(A)(1)(b) sets forth that an appellate court should determine an appeal "on its merits on the assignments of error set forth in the briefs." "Generally, appellate courts rule on assignments of error only and do not address mere arguments." *State v. Green*, 11th Dist. Trumbull No. 2018-T-0063, 2019-Ohio-1303, ¶ 18. However, in the interest of justice, courts have commonly addressed issues that are discernable within an appellant's brief. *Id.* at ¶ 19. In the interests of justice, we will consider this argument.

16

Case No. 2022-L-110

{¶48} Lawrence argues that Evid.R. 611(A) and (B) were violated, an issue which was not raised below and is properly evaluated under a plain error standard of review. Evid.R. 611(A) provides that a court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 611(B) provides that cross-examination "shall be permitted on all relevant matters and matters affecting credibility."

{¶49} We find no evidence of harassment or embarrassment in the questions highlighted by Lawrence, including questions about his employment, use and sale of marijuana, and details relating to the use and possession of his firearm. These questions were relevant to considerations such as how he earned money and to establish that he was dealing drugs, which helped support the Trafficking in Marijuana conviction. Significantly, they also followed up on questions asked during direct examination relating to Lawrence's sale of marijuana. Further, questions about Lawrence's use and possession of his firearm in conjunction with marijuana addressed his credibility relating to untruthfulness on his CCW application and also followed up on questions asked on direct relating to Lawrence's CCW permit and his past experience and training with firearms. We find no reversible error in this line of questioning.

{¶50} The first and third assignments of error are without merit.

{¶51} In his second assignment of error, Lawrence argues that the offenses for which he was convicted should have merged since they were allied offenses which occurred during one transaction.

17

Case No. 2022-L-110

{¶52} "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28. The State argues, however, that a plain error standard applies here. "An accused's failure to raise the issue of allied offenses of similar import in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3. At sentencing, the court indicated which offenses it merged and asked if there were any objections, to which defense counsel responded in the negative. However, when defense counsel subsequently spoke in Lawrence's defense, he then indicated that the Aggravated Murder, Kidnapping and Trafficking charges should merge since they were part of a course of conduct, although he conceded that the gun specifications would not merge. Even presuming that a de novo standard applies as to those offenses challenged, we find no error in the court's decision on merger.

{¶53} R.C. 2941.25 governs the imposition of punishment for multiple offenses:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶54} "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were

18

Case No. 2022-L-110

committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶55} Lawrence argues that "you cannot commit an aggravated Murder; Murder; Felonious Assault; Kidnapping separately on the same person when these acts all occur in the same transaction" and that "one cannot shoot without assaulting the person, and holding him down and close (sic), thereby committing kidnapping." Lawrence fails to recognize a few salient points. First, the offenses for Felonious Assault and Murder were merged into other convictions so it is unnecessary to address the argument as to those offenses. Second, the convictions for Aggravated Murder and Kidnapping relate not to the "same person" but involved separate victims. The Aggravated Murder conviction resulted from Lawrence shooting Gipson and the Kidnapping conviction was for holding Isaacs at gunpoint after the shooting. *Ruff* provides that "[t]wo or more offenses of dissimilar import exist * * * when the defendant's conduct constitutes offenses involving separate victims." *Id.* at paragraph two of the syllabus, ¶ 26 ("[w]hen a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts"). *See State v. Hardrick*, 2017-Ohio-623, 85 N.E.3d 160, ¶ 25 (11th Dist.) (where "there were two separate victims" to a bank robbery, "pursuant to *Ruff*, the trial court was without power to merge the aggravated robberies"). The remaining offense that was not merged,

19

Trafficking in Marijuana, can also be seen as having a separate victim, as drug trafficking has been viewed as an offense against society as a whole. *State v. Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607, ¶ 16 (4th Dist.).

{¶56} Further, there were separate actions and motivations for these three crimes. The Aggravated Murder was completed through the shooting of Gipson, which the testimony indicated Lawrence committed as an act of revenge for his alleged murder of Pace. After this act was complete, Lawrence pulled Isaacs out of the car, held him at gunpoint, and threatened him. Not only were these separate acts from shooting Gipson but the evidence indicated they occurred for the purpose of Isaacs reporting a robbery to support Lawrence's claim of self-defense. As to the offense of Trafficking in Marijuana, evidence supported a determination that this transaction was completed prior to the shooting and was conducted with a separate animus to receive payment for the marijuana versus the animus outlined above.

{¶57} Lawrence also argues that the firearm specifications should have merged because they arose out of the same transaction and continuous act.

{¶58} The trial court sentenced Lawrence to prison terms for two firearm specifications, those associated with Counts One and Five. Merger of these offenses was not appropriate here as a sentence was required for each of the counts.

{¶59} R.C. 2929.14(B)(1)(b) provides: "[a] court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section [governing sentencing on firearm specifications] for felonies committed as part of the same act or transaction," i.e., "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." (Citation omitted.) *State v. Wills*, 69 Ohio St.3d 690, 691, 635

20

N.E.2d 370 (1994). While "R.C. 2929.14(B)(1)(b) generally provides that multiple prison terms for firearm specifications are not permissible when the underlying felonies were" part of the same act or transaction, "[a]n exception to this rule is set forth in R.C. 2929.14(B)(1)(g)." *State v. Hope*, 2019-Ohio-2174, 137 N.E.3d 549, ¶ 155 (11th Dist.). R.C. 2929.14(B)(1)(g) provides:

> If an offender is convicted of * * * two or more felonies, if one or more of those felonies are aggravated murder * * * and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section [a specification under section 2941.141, 2941.144, or 2941.145 of the Revised Code of] in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶60} Since Lawrence was convicted of Aggravated Murder and firearm specifications under R.C. 2941.145 in connection with two or more felonies, the court was required to impose the prison term for the two most serious specifications. "The same act or transaction requirement does not apply under such circumstances." *Hope* at ¶ 157. Merger of these specifications was not warranted where they each required a sentence be ordered.

{¶61} The second assignment of error is without merit.

{¶62} In his fourth assignment of error, Lawrence argues that the consecutive sentences were not supported by the record, emphasizing his lack of a criminal record and that he acted in self-defense.

{¶63} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing

21

Case No. 2022-L-110

court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14 [or] * * * [t]hat the sentence is otherwise contrary to law." *Id.*

{¶64} "A sentence is contrary to law when it is 'in violation of statute or legal regulations,'" such as where it falls outside of the statutory range for the offense or where the trial court fails to consider the purposes and principles of sentencing under R.C. 2929.11 and the sentencing factors in R.C. 2929.12. *State v. Meeks*, 11th Dist. Ashtabula No. 2022-A-0060, 2023-Ohio-988, ¶ 11, quoting *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 34. We "cannot review alleged error under R.C. 2929.11 and R.C. 2929.12 to evaluate whether the sentencing court's findings for those sentences are unsupported by the record." *State v. Reed*, 11th Dist. Ashtabula No. 2022-A-0082, 2023-Ohio-1324, ¶ 13.

{¶65} While raised in the third assignment of error rather than under an assignment separately identifying it as error, we will first briefly address Lawrence's argument that he should be granted leniency in his sentence. A general request for leniency does not warrant reversal for error and we do not find that he raises a valid argument that his sentence was contrary to law. The lower court stated that it considered the required sentencing factors under R.C. 2929.11 and .12. As outlined above, we cannot review whether these are supported by the record. Further, his sentences are within the statutory range. R.C. 2929.03(A)(1)(d) (allowing a term of thirty years to life for

22

Aggravated Murder); R.C. 2929.14(A)(1)(a) (indefinite prison term for first degree felony is three to eleven years); R.C. 2929.14(A)(5) (indefinite prison term for fifth degree felony is six to twelve months). There are no legal grounds for this court to find the sentence was improper because the lower court should have been more "lenient."

{¶66} As to the consecutive nature of the offenses, pursuant to R.C. 2929.14(C)(4), separate prison terms for multiple offenses may be ordered to be served consecutively if the court finds it is "necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," *and* finds any of the R.C. 2929.14(C)(4)(a)-(c) factors are present. The pertinent R.C. 2929.14(C)(4)(a)-(c) factor here is (b): "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed * * * adequately reflects the seriousness of the offender's conduct."

{¶67} To reverse the consecutive sentencing findings, this court must "'clearly and convincingly find that the record does not support the court's findings.'" (Citation omitted.) *State v. Guth*, 11th Dist. Portage No. 2015-P-0083, 2016-Ohio-8221, ¶ 23; R.C. 2953.08(G)(2). There must be an "evidentiary basis" that is "adequate to fully support the trial court's consecutive-sentence findings." *State v. Gwynne*, __ Ohio St.3d __, 2022-Ohio-4607, ___ N.E.3d __, ¶ 29. "This requires the appellate court to focus on both the quantity and quality of the evidence in the record that either supports or contradicts the consecutive-sentence findings. An appellate court may not, for example, presume that

23

because the record contains *some* evidence relevant to and not inconsistent with the consecutive-sentence findings, that this evidence is enough to fully support the findings." *Id.* In evaluating consecutive sentences, the appellate court is "authorized to substitute its judgment for the trial court's judgment if [it] has a firm conviction or belief, after reviewing the entire record, that the evidence does not support the specific findings made by the trial court to impose consecutive sentences." *Id.*

{¶68} Lawrence does not argue that the court failed to make the necessary findings but contends that such findings were not supported by the record. The lower court found, both at the sentencing hearing and in the sentencing entry, that consecutive sentences are necessary to protect the public and punish Lawrence, are not disproportionate to his conduct and the danger he poses, and the harm is so great or unusual that a single term would not adequately reflect the seriousness of Lawrence's conduct. We do observe that, at the sentencing hearing, the court did not specifically state in relation to R.C. 2929.14(C)(4)(b) that "two of the multiple offenses were committed as part of one or more courses of conduct," although it specifically stated the seriousness portion of the finding. Nonetheless, we note that "a 'word-for-word recitation' of the language" of the statute is not required to order consecutive sentences. *State v. Olp*, 11th Dist. Ashtabula Nos. 2015-A-0033 and 2015-A-0034, 2016-Ohio-3508, ¶ 17. The court reviewed and discussed facts relating to the crimes occurring at the same time, which supports a conclusion that it found there was a course of conduct, i.e., including factual links such as time, location, and weapon. *State v. Squires*, 8th Dist. Cuyahoga No. 110059, 2021-Ohio-2035, ¶ 11. This satisfies the requirement to make the necessary findings and the remaining issue is whether these findings were supported by the record.

24

{¶69} Lawrence contends that the harm caused by the offenses was not so great as to warrant consecutive sentences, emphasizes his lack of a criminal record, and observes that his actions were taken in self-defense.

{¶70} As to the claim of self-defense, we emphasize that the jury determined Lawrence committed murder, and, thereby, did not act in self-defense. While Lawrence emphasizes his acts in self-defense in relation to the consecutive sentencing findings, it has been held that the sentencing court's refusal to consider a defendant's claim of self-defense in mitigation at sentencing is permissible based upon the jury's rejection of that theory. *State v. Blevins*, 2019-Ohio-2744, 140 N.E.3d 27, ¶ 97 (4th Dist.) ("[a]lthough Appellant's version of events supported a claim of self-defense, the jury rejected it and the trial court was free to reject it as well during the sentencing phase"). The facts support the sentencing judge's analysis and conclusion that the murder was an act of revenge, in a public place, while other individuals were present in the vehicle. This supports a finding both that there was a risk posed to the public and that there was great harm caused. Gipson lost his life, two individuals were impacted through watching their friend killed, and Isaacs suffered threats while held at gunpoint. The lower court properly considered the danger posed by this type of offense and the risk posed by such a defendant to the public in general.

{¶71} Lawrence also emphasizes his limited adult criminal record, which, according to the PSI includes only offenses for possession of marijuana and for no valid operator's license. This fact does not change the danger his actions posed to the public. R.C. 2929.14(C)(4) mentions a defendant's criminal record only in relation to a finding under (C)(4)(c), which finding was not made here. As such, it is not necessary to resolve

25

whether Lawrence's history of criminal conduct supports a finding that consecutive sentences are necessary. The danger he poses to the public, regardless of his criminal background, is evident from his conduct here, where he fired 14 shots in an apartment building parking lot, into a car occupied by three individuals, while also carrying and selling marijuana.

{¶72} The fourth assignment of error is without merit.

{¶73} For the foregoing reasons, Lawrence's sentences and/or convictions for Aggravated Murder, Murder, Felonious Assault, Kidnapping, and Trafficking in Marijuana in the Lake County Court of Common Pleas are affirmed. Costs to be taxed against appellant.


MARY JANE TRAPP, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2022-L-110