[Cite as *State v. Barker*, 2025-Ohio-5665.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

LONNIE L. BARKER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0007**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case Nos. 2023 CR 287, 2023 CR 362

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino*, Columbiana County Prosecutor, and *Atty. Steven V. Yacovone*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Catherine Meehan,* Patituce & Associates, LLC, for Defendant-Appellant.

Dated:  December 18, 2025

**HANNI, J.**

{¶1}    Defendant-Appellant, Lonnie L. Barker, appeals from a Columbiana County Common Pleas Court judgment convicting him of felonious assault, following a jury trial, and sentencing him to six to nine years in prison.  Appellant argues his conviction was against the manifest weight of the evidence, specifically claiming that he proved he acted in self-defense.  He also argues ineffective assistance of counsel and asserts the cumulative effect of counsel's errors were prejudicial to him.  Because Appellant's conviction is not against the manifest weight of the evidence and his counsel was not ineffective, Appellant's conviction is affirmed.

{¶2}    To begin, an explanation of those who were involved in this matter and who testified, is helpful.  Appellant is married to Valerie.  They have a minor daughter, A.B., who was 16 at the relevant time, and an adult daughter, Kaylee.  The victim in this case is Jennifer.  Jennifer is Valerie's sister/Appellant's sister-in-law.  Jennifer has an adult daughter, Nicole.  Jennifer also has a minor son, C.C., who was 12 at the relevant time.

{¶3}    On May 9, 2023, A.B. was involved in an altercation with a woman at a Sheetz parking lot.  Nicole picked her up.  Both Jennifer and Appellant were aware that A.B. had been in a fight.  Jennifer advised Nicole to take A.B. to the police station to make a statement.  When Appellant learned this, he told A.B. not to go to the police because he did not want to get the police involved and thought A.B. might be at least partially at fault.  Appellant wanted A.B. to come home.  He and Nicole argued on the phone.  Nicole and A.B. then went to Jennifer's house.  A.B. was upset and afraid to go home.

{¶4}    After Nicole and A.B. arrived at Jennifer's house, Appellant showed up. There was conflicting testimony about whether Jennifer's door was open or not but the testimony was consistent that Appellant arrived and began yelling into the house for A.B. to come home with him.  According to some witnesses, Appellant was irate, screaming and pushing his way into the house.  These witnesses also stated that Appellant got into a tussle with Nicole as she tried to push him out of the house.  The window trim on Jennifer's door was broken in the affray.  Nicole stated Appellant grabbed her by the shirt and by the hair.  Once they were outside, Nicole hit Appellant with a landscaping rock.

Jennifer called the police. Appellant left before the police arrived. A.B. spent the night at Jennifer's house.

{¶5} The next evening, May 10, 2023, A.B. texted Appellant and asked him to gather some of her personal items to pick up. Appellant placed the items outside on top of a garbage can and sent A.B. a picture of them. But instead of A.B. going to pick up the items, Jennifer went to retrieve them. Jennifer brought C.C. with her. Jennifer pulled into Appellant's driveway. C.C. got out of the passenger side and got A.B.'s belongings from the top of the garbage can. Appellant then appeared outside and approached Jennifer's car. C.C. got back in the car.

{¶6} The testimony was conflicting as to what exactly happened next.

{¶7} According to Appellant, Jennifer was yelling at him and attempted to hit or slap him through her open driver's side window. Appellant stated that he was trying to talk to her about having A.B. at her house. Jennifer then got out of her vehicle and punched him. Appellant claimed that he then hit Jennifer back in self-defense. Valerie came out of the house when she heard Jennifer yelling. Valerie's account of what happened matched Appellant's testimony.

{¶8} According to Jennifer, she got out of her vehicle and then Appellant started poking at her with his finger and calling her a "piece of shit." She stated that Appellant then "head-butted" her in the face and struck her once more. She fell to the ground. Jennifer stated that she briefly lost consciousness. C.C. testified and corroborated Jennifer's testimony.

{¶9} Jennifer was then able to get back into her vehicle and drive herself and C.C. to the hospital. She was missing her two front teeth and two other teeth were loose. The two teeth that were loose were not able to be saved so in all Jennifer, lost her four front teeth.

{¶10} On July 12, 2023, a Columbiana County Grand Jury indicted Appellant on one count of felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1), for the May 10, 2023 incident. In a separate indictment, the grand jury indicted Appellant on one count of aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(1), for the May 9, 2023 incident. The two cases initially proceeded separately. But in July 2024, Appellant and Plaintiff-Appellee, the State of Ohio, began engaging in

possible plea negotiations that would consider the two cases together. The parties never reached a plea agreement. But the parties did agree to join the two cases for trial.

{¶11} The matter then proceeded to trial on March 11, 2025. The jury found Appellant guilty of felonious assault but not guilty of aggravated burglary.

{¶12} The trial court subsequently held a sentencing hearing on March 20, 2025. The court sentenced Appellant to an indefinite prison term of six years (minimum) to nine years (maximum).

{¶13} Appellant filed a timely notice of appeal on March 27, 2025. He now raises three assignments of error.

{¶14} Appellant's first assignment of error states:

APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF
THE EVIDENCE.

{¶15} Appellant claims his conviction is against the manifest weight of the evidence. Specifically, Appellant submits that the State failed to prove beyond a reasonable doubt that he did not act in self-defense. He states the evidence was contradictory at best. He points out the differences between his testimony, corroborated partially by Valerie's testimony, and the testimony of Jennifer and C.C. Appellant further argues that he did not violate any duty to retreat because he was on his own driveway. And he goes on to argue that Jennifer was not a credible witness. He also asserts C.C. could not keep the details of the incident consistent.

{¶16} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* at 387, quoting *Black's Law Dictionary* (6 Ed.1990) (Emphasis in original). In making its determination, a reviewing court is not required to view the evidence in a light most

favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id*. at 390.

**{¶17}** Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 2005-Ohio-6328, ¶ 49 (7th Dist.), citing *State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 2002-Ohio-1152 (7th Dist.).

**{¶18}** Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *State v. Woullard*, 2004-Ohio-3395, ¶ 81 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins*, 78 Ohio St.3d at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 2002-Ohio-4931, ¶ 36, quoting Ohio Const., art. IV, § 3(B)(3).

**{¶19}** The jury convicted Appellant of felonious assault in violation of R.C. 2903.11(A)(1), which provides: "No person shall knowingly . . . [c]ause serious physical harm to another[.]"

**{¶20}** "Serious physical harm" includes:

> . . .
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

**{¶21}** Appellant does not argue that the State failed to prove the above elements of felonious assault beyond a reasonable doubt. Instead, Appellant asserted that he acted in self-defense and the State failed to prove that he did not act in self-defense.

**{¶22}** In order to establish a self-defense claim, a defendant must show that: (1) he was not at fault in creating the situation that gave rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and the only means of escape from such a danger was in the use of such force; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Smith*, 2020-Ohio-4976, ¶ 48 (1st Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). These three elements are cumulative, so a defendant's self-defense claim fails if any one of the elements is not present. *Id.*, citing *State v. Cassano*, 2002-Ohio-3751, ¶ 73.

**{¶23}** When the defendant presents evidence that tends to support that he acted in self-defense, the State bears the ultimate burden in proving beyond a reasonable doubt that the defendant's conduct was not in self-defense. *Id.* at ¶ 49. To this point, R.C. 2901.05(B)(1) provides:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶24}** Quoting the Tenth District, this Court has discussed the credibility issue when it comes to a claim of self-defense:

> " 'A self-defense claim is generally an issue of credibility.' " *State v. Lawrence*, 11th Dist. No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. " 'Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.' " *Id.*, quoting *State v. Bentley*, 11th Dist. No. 2022-L-076, 218 N.E.3d 989, 2023-Ohio-1792, ¶ 24. " 'It has been held that "a conviction

is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version" and rejected the defendant's claim of self-defense.' " *Id.*, quoting *Bentley* at ¶ 24, quoting [*State v.*] *Messenger*, 2021-Ohio-2044, at ¶ 49 [10th Dist.], 174 N.E.3d 425.

*State v. Morgan*, 2024-Ohio-5843, ¶ 40 (7th Dist.), quoting *State v. Jamii*, 2023-Ohio-4671, ¶ 78 (10th Dist.).

**{¶25}** Thus, in considering whether the jury's verdict was against the manifest weight of the evidence, we must consider the evidence presented as to the May 10, 2023 felonious assault. Other evidence and testimony was presented that dealt with the May 9, 2023 incident. But because Appellant was acquitted of the aggravated burglary charge, it will not be discussed herein.

**{¶26}** The parties stipulated that Jennifer presented to East Liverpool Hospital on May 10, 2023, with a laceration on her lip and loose and missing teeth after reporting she was assaulted by Appellant. (Tr. 300). She was diagnosed with a soft tissue injury to her lip as well as avulsed, forcible separation or detachment, of her teeth. (Tr. 300). The avulsed teeth qualify as serious physical harm. (Tr. 300). And Appellant admitted to striking Jennifer in some manner. (Tr. 773). So the only real issue in this case was whether Appellant acted in self-defense.

**{¶27}** Jennifer testified that she took C.C. with her to Appellant's house to pick up some of A.B.'s personal items. (Tr. 228-229). The items had been left outside sitting on top of a garbage can. (Tr. 229-230). She pulled into the driveway and C.C. retrieved the items from the garbage can. (Tr. 231-232). Jennifer stated that Appellant then "jumps up" from somewhere on the porch. (Tr. 232). C.C. got back into Jennifer's car. (Tr. 232). Appellant approached Jennifer's driver's side door. (Tr. 236). She got out of her vehicle. (Tr. 236). Jennifer stated that Appellant began poking her with his finger and calling her a "piece of shit." (Tr. 236). She stated Appellant then "head-butted" her in the face and she fell to the ground. (Tr. 236). Jennifer stated that she lost consciousness briefly because she next remembered C.C. screaming that she was covered in blood and saw her sister Valerie coming outside. (Tr. 238-239). Jennifer was able to get back in her vehicle. (Tr. 239). She stated that C.C. called 911. (Tr. 240). Jennifer then drove herself

to the hospital. (Tr. 240). She stated she was missing two teeth, two other teeth were loose, and she had a concussion. (Tr. 240). The two teeth that were loose were not able to be salvaged so in all, Jennifer lost her four front teeth. (Tr. 241).

{¶28} Liverpool Township Police Officer Jay Cargnel responded to East Liverpool City Hospital after he was dispatched regarding an assault. When he arrived, Officer Cargnel found Jennifer in the waiting room. (Tr. 407). The officer stated Jennifer was hysterical and crying. (Tr. 407). He noticed that she had lacerations to her lips, her two front teeth were missing, and her nose was bloody and swollen. (Tr. 407-408). Despite her condition, Officer Cargnel was able to take Jennifer's statement. (Tr. 408). Jennifer relayed to the officer that she went to Appellant's home to retrieve some items for A.B. (Tr. 409). While she was in the driveway, Appellant approached her and the two exchanged words. (Tr. 408). She told the officer that Appellant then head-butted her in the face and struck her once more. (Tr. 408-409). She woke up on the ground covered in blood. (Tr. 409).

{¶29} Officer Cargnel testified that he also talked with C.C. at the hospital. He stated that C.C. was frantic and crying. (Tr. 411). C.C. told the officer that he got out of Jennifer's car and retrieved A.B.'s belongings from on top of the garbage can. (Tr. 411). He then saw Appellant approaching the car. (Tr. 411). C.C. stated that he saw Appellant strike and head-butt Jennifer. (Tr. 411-412).

{¶30} C.C. testified that he went with his mom, Jennifer, to pick up A.B.'s belongings from Appellant's house so his mom would not have to go by herself. (Tr. 458-459). He stated Jennifer parked in the driveway while he got out and retrieved A.B.'s belongings from on top of a trash can. (Tr. 461). He stated that Appellant then "popped up" from behind the trash can or the porch. (Tr. 462). C.C. stated that he was afraid and just wanted to get back home. (Tr. 463). He testified that Appellant walked up to Jennifer's window, started calling her names, and told her to step out of the car to talk. (Tr. 463). C.C. stated Appellant's tone was "in between both of calmly and yelling." (Tr. 464). When Jennifer stepped out of the car, Appellant was then "completely angered". (Tr. 464). C.C. described that Appellant began poking Jennifer in the shoulder with his finger. (Tr. 464-465). Appellant then head-butted Jennifer in the head and she fell to the ground. (Tr. 464-465). C.C. stated he then got back out of the car and ran to his mom.

(Tr. 465). He stated he also yelled at Appellant not to put his hands on Jennifer. (Tr. 465-466). C.C. testified he and Jennifer got back in the car and Jennifer drove to the hospital with blood all over her face while he called the police. (Tr. 466-467). C.C. testified that Jennifer did not hit or take a swing at Appellant. (Tr. 467).

{¶31} Kaylee, Appellant's and Valerie's adult daughter, was on the phone on FaceTime with Valerie at the time of the May 10 incident. Kaylee testified that during their call, Valerie walked outside and Kaylee could hear her Aunt Jennifer screaming. (Tr. 593). She also heard gravel "scuffling". (Tr. 593). Kaylee stated that Valerie told her to call 911 because Jennifer was hitting Appellant. (Tr. 595). She testified that she used her ex-boyfriend's phone to call Liverpool Township Police. (Tr. 598).

{¶32} Valerie testified that she believed A.B. was coming to pick up her belongings. (Tr. 701-702). She was not expecting Jennifer and C.C. (Tr. 700-702). Valerie was sitting in the kitchen talking with Kaylee on FaceTime when she saw Jennifer pull into the driveway. (Tr. 702). At the time, she testified Appellant was outside smoking. (Tr. 703). She then heard Jennifer start screaming. (Tr. 703). She told Kaylee to call the police and went outside. (Tr. 703-704). Valerie testified that she saw Jennifer attempt to smack Appellant through her open car window. (Tr. 704). She stated Jennifer then got out of her car and hit Appellant. (Tr. 704). Valerie testified that Appellant hit Jennifer back. (Tr. 704). She then saw C.C. come around the car and heard him tell Appellant not to hit his mom. (Tr. 705). Valerie stated that she did not see Appellant head-butt Jennifer. (Tr. 706). Valerie only saw Appellant hit Jennifer once in the face after Jennifer hit him. (Tr. 706). She testified that she did not see any injuries to Appellant's face that night. (Tr. 750).

{¶33} Appellant testified that on the night in question he had texted with A.B. and told her she could come pick up some of her belongings. (Tr. 767-768). He stated he did not tell Jennifer that she could come to pick the items up. (Tr. 767). Appellant stated he put A.B.'s things outside for her. (Tr. 768). He had planned on making A.B. stay home once she got there. (Tr. 768). But instead, Appellant testified, Jennifer and C.C. showed up to pick up A.B.'s things. (Tr. 769). Appellant stated that when he saw C.C., he tried to jokingly scare him by jumping out from the porch. (Tr. 769-770). Appellant testified that after C.C. retrieved A.B.'s things, he followed C.C. back to Jennifer's car. (Tr. 770).

He approached the driver's side and looked inside thinking he would find A.B. (Tr. 770). When he did not see A.B., Appellant stated he then confronted Jennifer about A.B.'s whereabouts. (Tr. 771). He stated that Jennifer began yelling at him and attempted to stick her hand out of the vehicle's window to "backhand" him. (Tr. 771-772). Next, Appellant claimed, Jennifer got out of her car and hit him. (Tr. 773). So he hit her back. (Tr. 773). Appellant testified he acted in self-defense. (Tr. 773). He said he "did not mean to hurt her that bad." (Tr. 773). Appellant denied ever head-butting Jennifer. (Tr. 775).

{¶34} On cross-examination, Appellant admitted to two prior felony convictions. (Tr. 781). He admitted to a having weapons while under disability conviction. (Tr. 781). He further admitted that despite this disability, he still owned firearms. (Tr. 781).

{¶35} Appellant does not contest that the State proved the elements of felonious assault beyond a reasonable doubt. And Appellant did not show each of the three elements required for self-defense. Therefore, the jury's verdict was not against the manifest weight of the evidence. Specifically, Appellant did not put forth any evidence whatsoever that he had a bona fide belief that he was in imminent danger of death or great bodily harm from Jennifer and his only means of escape from such a danger was in the use of such force (the second self-defense element). On this basis, Appellant's self-defense claim fails.

{¶36} This case came down to a matter of credibility.

{¶37} According to Jennifer, a verbal altercation began when she got out of her vehicle in Appellant's driveway. Appellant next began poking her in her shoulder with his finger. Appellant then "head-butted" Jennifer in the face causing her to fall to the ground and briefly lose consciousness. C.C. corroborated Jennifer's testimony. He too testified that Appellant first was poking Jennifer in the shoulder and then head-butted her. C.C. watched his mother fall to the ground. Officer Cargnel, who responded to the hospital, testified that both Jennifer and C.C. relayed to him that Appellant had "head-butted" Jennifer in the face.

{¶38} According to Appellant, Jennifer was yelling at him and trying to slap him through her open driver's-side window. When she exited her vehicle, Jennifer hit him. Appellant said he then hit Jennifer back in self-defense. Valerie also testified as to this

version of events. Appellant denied ever head-butting Jennifer and Valerie denied seeing this too.

**{¶39}** Whether to believe Appellant's version of the events of May 10 or to believe Jennifer's version was a matter of credibility for the jurors to determine. Although an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give deference to the fact finder's determination of witnesses' credibility. *State v. Jackson*, 2009-Ohio-6407, ¶ 18 (7th Dist.). The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶40}** Here, the jury clearly found Jennifer and C.C. to be the more credible witnesses. This was their decision to make. We will not second-guess the credibility determinations of the jury on appeal. As stated above, when two fairly reasonable views of the evidence or two conflicting versions of events exist, it is not the job of the Court to choose which one we believe. *Dyke*, 2002-Ohio-1152 (7th Dist.). Therefore, Appellant's conviction is not against the manifest weight of the evidence.

**{¶41}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶42}** Appellant's second assignment of error states:

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATE'S [sic] CONSTITUTION AND ARTICLE I, SEC. 10 OF THE OHIO CONSTITUTION[.]

**{¶43}** Here, Appellant argues his counsel was ineffective for several reasons.

**{¶44}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was

prejudiced by counsel's performance. *Id*. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley* at paragraph three of the syllabus.

**{¶45}** Appellant bears the burden of proof on the issue of counsel's ineffectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). In Ohio, a licensed attorney is presumed competent. *Id*.

**{¶46}** First, Appellant asserts his counsel failed to object to the leading questions by the prosecutor that portrayed him as "an angry man with a temper and a short fuse." Specifically, he takes issue with three lines of questioning.

**{¶47}** During Jennifer's direct examination, the following exchange took place:

Q. Okay. What about a temper? How's his [Appellant's] temper?

A. Real bad.

Q. Kind of short-fused?

A. Very short-fused.

Q. Do you make attempts not to anger Mr. Barker?

A. Yes.

(Tr. 205).

**{¶48}** And during Nicole's direct examination, the prosecutor asked the following:

Q. All right. Do you know Lonnie Barker to have a little bit of an anger problem?

A. More than a little bit.

Q. Short fuse?

A. Very short fuse.

Q. Gets mad easily?

A. Extremely.

(Tr. 306).

**{¶49}** Finally, during C.C.'s direct examination, the following questions were asked:

Q.  Okay.  And did he [Appellant] also, during that time, have a bit of a temper?

A.  Yes, ma'am.

Q.  Okay.  How bad was his temper?

A.  It was pretty bad.

Q.  Okay.  Because you knew that he had a bad temper - -

MR. AMATO [defense counsel]:  Your Honor, we're going to object to any character evidence.

THE COURT:  Well -- all right.  The objections [sic] noted, but it's overruled.  You can continue.

. . .

Q.  Did you try to avoid making Lonnie mad?

A.  Yes, ma'am.

(Tr. 450-451).

**{¶50}** Appellant argues these leading questions were meant to paint him in a negative light.  He argues his counsel's failure to object to these leading questions constituted ineffective assistance of counsel.

**{¶51}** Most of these questions were not leading.  "'A leading question then is one that suggests to the witness the answer desired by the examiner.'" *State v. Crome*, 1997 WL 599155, *2 (10th Dist. Sept. 25, 1997), quoting McCormick, *Evidence* (4 Ed.1992) § 6, 17-18.  The above questions, which Appellant takes issue with, do not necessarily suggest the answer.  Questions like "how is Appellant's temper?" and "did you try to avoid making him mad?" do not suggest the answer.  They could be answered in different ways.

Case No. 25 CO 0007

**{¶52}** Moreover, even if some of the questions could be construed as leading, the failure to object was not ineffective assistance of counsel. In rejecting the appellant's claim that trial counsel performed ineffectively by failing to object to leading questions, the Fourth District explained:

> "Evid.R. 611(C) does not preclude the use of leading questions on direct examination; instead, the rule provides that 'it is within the trial court's discretion to allow leading questions on direct examination.' " *State v. Williams*, 4th Dist. Jackson No. 15CA3, 2016-Ohio-733, ¶ 34, quoting *State v. Jackson*, 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001). Accordingly, "the failure to object to leading questions does not constitute ineffective assistance of counsel." *Id.*, quoting *Jackson*, 92 Ohio St.3d at 449, and citing *State v. Stairhime*, 3d Dist. Defiance No. 4-13-06, 2014-Ohio-1791, ¶ 46 (stating that "we cannot find that any failure to object to any leading questions would rise to the level of ineffective assistance of counsel").

*State v. Carroll*, 2016-Ohio-7218, ¶ 32 (4th Dist.).

**{¶53}** Second, Appellant argues his counsel should have played an audio recording of a call from Kaylee to Liverpool Township Police that she made while the incident at issue was occurring. He notes that both Kaylee and Valerie testified that Kaylee called the police while Jennifer and Appellant were arguing in the driveway. Appellant points out that the State used a police report of logged calls (State's Ex. 12) to suggest Kaylee did not actually make a call to police because it was not logged into the call log report. (Tr. 601-602). Appellant argues that an audio recording of Kaylee's phone call to Liverpool police existed and defense counsel was ineffective for failing to play it for the jury to rebut the police report and salvage Kaylee's credibility.

**{¶54}** Kaylee testified that during her FaceTime call with Valerie, Valerie walked outside and Kaylee could hear her Aunt Jennifer screaming. (Tr. 593). Kaylee stated that Valerie told her to call 911 because Jennifer was hitting Appellant. (Tr. 595). So she used her ex-boyfriend's phone to call Liverpool Township Police. (Tr. 598). Valerie corroborated Kaylee's testimony. Valerie testified that she instructed Kaylee to call the police because she heard Jennifer screaming outside. (Tr. 703-704).

{¶55} There was an indication by the prosecution that Kaylee's call to police was not recorded on a call log. (Tr. 601-602). But Kaylee indicated that the log stated, "ELPD called and said the Aunt Jennifer . . . was C8 [sic] at Valerie's house by Lonnie Barker. I made the call to tell them that she was there." (Tr. 602). Thus, Kaylee cleared the matter up. And her testimony as to placing the call was corroborated by Valerie.

{¶56} Moreover, Appellant cannot demonstrate that but for this alleged error, the result of the trial would have been different. As discussed above, this case hinged on Appellant's credibility versus Jennifer's credibility. Kaylee was not even present at the scene on the night in question. Based on the above, defense counsel was not ineffective for failing to play an audio recording of Kaylee's call to the police.

{¶57} Third and finally, Appellant asserts his counsel should have objected to the prejudicial joinder of the two separate indictments for trial. He contends he was prejudiced by the joinder claiming evidence of one incident would not have been admissible at a trial on the other incident and served to confuse the jury.

{¶58} As early as July 2024, both the State and Appellant were considering the felonious assault case and the aggravated burglary case together. In its July 1, 2024 judgment entry, the court stated "The Defendant has multiple cases pending and they are attempting to achieve a global resolution." This hopeful "global resolution" was again referenced by the court in its August 27, 2024 and January 10, 2025 judgment entries. In its January 29, 2025 and February 28, 2025 judgment entries, the trial court referenced the parties' agreement to join the two cases for trial. And in its March 18, 2025 judgment entry, the trial court indicated the parties had agreed on the record to join the two cases for trial.

{¶59} This was not a case where the State was seeking to unilaterally join the two cases for trial. Instead, this was a long process of attempted plea negotiations that ultimately resulted in a trial. For over eight months, both Appellant and the State agreed to, and were treating, the two cases as joined.

{¶60} Whether to proceed with the joinder of offenses may be a matter of counsel's trial strategy. *State v. Benitez*, 2013-Ohio-2334, ¶ 31 (8th Dist.), citing *State v. Bishop*, 1988 WL 5996 (8th Dist. Jan. 21, 1988). An appellate court will not second-guess

decisions of counsel which can be considered matters of trial strategy. *State v. Rogers*, 2015-Ohio-2093, ¶ 24 (7th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98 (1985).

**{¶61}** The offenses charged in the two cases arose out of the same course of conduct. And each case also required many of the same witnesses. Additionally, the jury clearly considered the evidence of each alleged crime separately since it found Appellant not guilty of aggravated burglary yet guilty of felonious assault. Thus, Appellant's counsel was not ineffective for agreeing to join the two offenses for trial.

**{¶62}** Accordingly, Appellant's second assignment of error is without merit and is overruled.

**{¶63}** Appellant's third assignment of error states:

THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS DEPRIVED APPELLANT OF A FAIR TRIAL.

**{¶64}** Finally, Appellant asserts that even if the individual instances of defense counsel's ineffectiveness were harmless, the cumulative effect of those errors created a prejudice to him warranting reversal of his conviction.

**{¶65}** Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). When this court finds no error, the doctrine does not apply. *State v. Lyons*, 2017-Ohio-4385, ¶ 46 (7th Dist.).

**{¶66}** As discussed above, defense counsel was not ineffective. The errors Appellant alleges were not errors at all, let alone prejudicial errors.

**{¶67}** Accordingly, Appellant's third assignment of error is without merit and is overruled.

**{¶68}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, P.J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**